**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAREK JONES and MICAH AMMERMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RAMBOLL LIMITED, RAMBOLL US CONSULTING, INC., BOARD OF DIRECTORS FOR RAMBOLL US CONSULTING, INC., RAMBOLL US RETIREMENT & SAVINGS PLAN SETTLOR COMMITTEE, RAMBOLL US RETIREMENT & SAVINGS PLAN FIDUCIARY COMMITTEE, RAMBOLL US RETIREMENT & SAVINGS PLAN INVESTMENT COMMITTEE, and JOHN DOES 1-40,<br><br>Defendants. | CIVIL ACTION NO.:  5:26-cv-273 (BKS/ML) |

**CLASS ACTION COMPLAINT**

Plaintiffs, Darek Jones and Micah Ammerman ("Plaintiffs"), by and through their attorneys, on behalf of the Ramboll US Retirement & Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Ramboll Limited, Ramboll US Consulting, Inc. (collectively

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Ramboll Limited and Ramboll US Consulting, Inc. are referred to as "Ramboll" or the "Company"), the Board of Directors for Ramboll US Consulting, Inc. (the "Board"), the Ramboll US Retirement & Savings Plan Settlor Committee ("Settlor Committee"), the Ramboll US Retirement & Savings Plan Fiduciary Committee ("Fiduciary Committee"), and the Ramboll US Retirement & Savings Plan Investment Committee ("Investment Committee") (collectively, the Company, the Board, the Settlor Committee, the Fiduciary Committee, and the Investment Committee are referred to as "Defendants").

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the Plan, at 10 ("The Plan is a defined contribution plan[.] ... The Plan was established on February 1, 1999, and was restated effective May 09, 2022, and is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 F.Appx. 24 (2nd Cir. 2016).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "[e]stablish a prudent

process for selecting investment options and service providers" and "[m]onitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

---

[2]  Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

8.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.     At all times during the Class Period, the Plan had at least five hundred thousand dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $551,853,326 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

10.     By 2024, the Plan had $659,089,426 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

11.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 2,617 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 3,041 participants. *See* 2024 Form 5500 for the Plan, at 2.

12.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13.     Specifically, Defendants allowed substantial assets in the Plan to be invested in a Guaranteed Income Fund ("Prudential GIF"), a group annuity insurance contract. The Prudential GIF provided a significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

4

14. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

15. Prudential benefited significantly from Plan participants being invested in the Prudential GIF. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Prudential GIF was benefiting Prudential at the expense of the participants in the Plan. The investments in the Prudential GIF were held and invested by Prudential, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Prudential provided to the Plan were and are so low that Prudential reaped a windfall on the spread.

16. Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Prudential,[4] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Prudential GIF.

17. The arrangements and transactions with Prudential/Empower are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the

---

[4] "Since the change in Plan trustee in March 2020, certain Plan investments are managed by Prudential. Prudential is the trustee as defined by the Plan and, therefore, these transactions qualify as party-in-interest transactions[.]" Auditor's Report, attached to 2020 Form 5500 for the Plan, at 15; *see also* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 7 ("The trustee and recordkeeper of the Plan are Empower Trust Company, LLC and Empower Retirement, LLC, respectively (collectively, Empower), formerly Prudential Bank & Trust, FSB until it was merged into Empower in March 2023."). As a result of the merger, references to Prudential include Empower where appropriate.

plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

18. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

19. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violations of ERISA's prohibited transactions (Counts III).

## II. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

21. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

22. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

#### Plaintiffs

23.   Plaintiff, Darek Jones ("Jones"), resides in Petersburg, Virginia. During his employment, Plaintiff Jones participated in the Plan. Mr. Jones invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to underperformance of the Prudential GIF.

24.   Plaintiff, Micah Ammerman ("Ammerman"), resides in Lancaster, Pennsylvania. During his employment, Plaintiff participated in the Plan. Mr. Ammerman invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to underperformance of the Prudential GIF.

25.   Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

26.   Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

#### Defendants

##### Company Defendant

27.   Ramboll Limited is the Plan sponsor and a Plan administrator with a principal place of business at 333 W. Washington Street, Syracuse, New York, 13202. *See* 2024 Form 5500 of the Plan, at 1. But *see also* 2022 Form 5500 wherein Ramboll US Consulting, Inc. is identified as the Plan sponsor; *see also* Ramboll US Retirement & Savings Plan Summary Plan Description, dated

7

May 9, 2022 ("The Plan Sponsor and Plan Administrator is Ramboll US Consulting, Inc. and its US-based affiliated entities."); Adoption Agreement for the Ramboll US Retirement & Savings Plan ("Plan Doc.") ("Name of adopting employer (Plan Sponsor): Ramboll US Consulting, Inc. and its US-based affiliated entities.").

28. "The Company is the official Plan Administrator and named fiduciary for the Plan." Joint Charter Ramboll US Retirement & Plan Settlor Committee and the Ramboll US Retirement & Savings Plan Fiduciary Committee, Effective as of October 7, 2020 ("Joint Charter"), at 5.

29. The Plan is administered by the Settlor Committee and the Fiduciary Committee, whose members are appointed by the Company. *See* Joint Charter, at 4 ("The Settlor Committee. Membership of the Settlor Committee shall be specified by the Board. The Fiduciary Committee. The members of the Fiduciary Committee are hereby appointed by the Board …").

30. "Ramboll US Corporation has delegated fiduciary responsibilities to the [Investment] Committee." Ramboll US Retirement & Savings Plan Investment Policy Statement ("IPS"), at 1.

31. Accordingly, Ramboll during the putative Class Period, is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it had a duty to monitor the actions of the Committees.

32. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

33. Ramboll, acting through its Board, appointed the Settlor Committee and the Fiduciary Committee. *See* Joint Charter, at 4 ("The Settlor Committee. Membership of the Settlor

8

Committee shall be specified by the Board. The Fiduciary Committee. The members of the Fiduciary Committee are hereby appointed by the Board …”).

34.    The Committees are created and given authority by the Board and are responsible to the Board.” *Id.*, at 7; *see also id.*, at 8:

> The Settlor Committee. The Board shall take any and all actions necessary to ensure that the operation of the Settlor Committee is in accordance with this Charter and any applicable additional or supplemental governing documents. At any time, the Board has the authority to replace one, more than one or all members of the Settlor Committee or to dissolve the Settlor Committee in its absolute discretion.
>
> The Fiduciary Committee. The Settlor Committee and/or the Board shall take any and all actions necessary to ensure that the operation of the Fiduciary Committee is in accordance with this Charter and any applicable additional or supplemental governing documents. At any time, the Settlor Committee and/or the Board have the authority to replace one, more than one or all members of the Fiduciary Committee or to dissolve the Fiduciary Committee in their absolute discretion.

35.    Each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each had a duty to monitor the actions of the Committees.

36.    The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the “Board Defendants.”

### Settlor Committee Defendants

37.    Ramboll appointed the Settlor Committee to, among other things:

> 1. To approve the establishment of new retirement Plan covering employees of the Company (with the caveat that, to the extent that such new Plan is established, it shall thereafter be the “Plan” referenced in this Charter);
>
> 2. To allocate such budgetary resources as are made available to the Company with respect to the Plan;

9

3. To amend the Plan (except to the extent that such amendment authority has been delegated to the Fiduciary Committee) or terminate the Plan;

4. To engage with and appoint a Co-Fiduciary of the Plan; and

5. To appoint one or more individual representatives or committees who shall represent the Company in the discharge of the Company's role as legal "plan administrator" of the Plan (the "Administrator").

Joint Charter, at 2.

38.     The Settlor Committee and each of its members during the putative Class Period are/were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they had a duty to monitor the actions of the Fiduciary Committee.

39.     The Settlor Committee and unnamed members of the Settlor Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Settlor Committee Defendants."

**Fiduciary Committee Defendants**

40.     Ramboll and the Settlor Committee Defendants appointed the Fiduciary Committee Defendants to, among other things:

1. To assist and advise the Settlor Committee with respect to all of the preceding powers, authorities and responsibilities;

2. To provide oversight and maintenance of the Plan, including, but not limited to, ensuring that the Plan satisfies all applicable legal requirements in operation;

3. To evaluate, select, retain, appoint, or terminate the service providers for, and the services to be provided with respect to, the Plan. (For this purpose, the term "service providers" includes, but is not limited to, counsel, accountants, investment advisors, insurers, trustees, consultants or other advisors. "Services" include, but are not limited to, legal services, accounting services, investment advisory services (whether on a Plan-wide or participant level), and the like.)

4. To receive and review periodic reports on the administration and operation of the Plan to ensure the achievement of its intended purposes;

10

5. To oversee major issues of administration and interpretive questions with respect to the Plan;

6. On the advice of the Plan's attorneys and other advisors, to consider, approve, and adopt any required compliance and/or other amendments to the Plan that would not have a material financial cost impact;

7. To empower and delegate to appropriate Company employees such day to day powers and obligations as are normally incumbent of an employer's administrative duties, such as coordination of vendors, termination of employment verification and the like;

8. To oversee correspondence with federal and state administrative agencies with respect to the Plan and personnel practices;

9. To receive periodic briefings regarding compliance with regulatory requirements, including the Employee Retirement Income Security Act of 1974, as amended ("ERISA");

10. To conduct reviews, in consultation with the Plan's co-fiduciary, of investment managers for performance, including a review of material changes to personnel, performance and adherence to the investment manager's asset class;

11. To issue warnings, in consultation with the Plan's co-fiduciary, for removal of an investment for inadequate performance;

12. To determine and approve, in consultation with the Plan's investment co-fiduciary, the investment policy for the Plan, to the extent applicable;

13. To receive and review periodic reports about the status of the funding and investment of the Plan, in consultation with the Plan's investment co-fiduciary;

14. In consultation with the Plan's investment co-fiduciary, to hire investment managers and advisors, and remove managers and appoint new managers;

15. To ensure, in consultation with the Plan's investment co-fiduciary, that the investment menus of the Plan that offer participant-directed investments contain prudent investment choices and enable participants a meaningful opportunity to manage their accounts across the risk/return spectrum;

16. To establish, in consultation with the Plan's investment co-fiduciary, investment policies for default investments (i.e., investment of accounts where direction is not received by participants);

11

17. In consultation with the Plan's investment co-fiduciary, to add, remove, and/or replace funds in the Plan's investment lineup;

18. To hire and remove such other investment professionals as are needed to effect investment transactions and/or asset ownership;

19. To designate authorized signers on behalf of the Company for the Plan and/or affiliate Plan, to the extent required by the financial or other institution.

Joint Charter, at 2-3.

41.    The Fiduciary Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

42.    The Fiduciary Committee and unnamed members of the Fiduciary Committee during the Class Period (referred to herein as John Does 21-30), are collectively referred to herein as the "Fiduciary Committee Defendants."

**Investment Committee Defendants**

43.    Ramboll "delegated fiduciary responsibilities to the [Investment] Committee" including:

- Acting solely in the interest of plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them;
- Carrying out their duties prudently;
- Following the plan documents (unless inconsistent with ERISA);
- Diversifying plan investments; and
- Paying only reasonable plan expenses.

IPS, at 1-2.

44.    Further, the Investment Committee, "in conjunction with its consultant, utilizes the investment criteria described in Appendix A to select and monitor plan investment options." *Id.*, at 2.

12

45.    The Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

46.    The Investment Committee and unnamed members of the Investment Committee during the Class Period (referred to herein as John Does 31-40), are collectively referred to herein as the "Investment Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[5]

47.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Ramboll US Retirement & Savings Plan, at any time between February 20, 2020 through the date of judgment (the "Class Period").

48.    The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 3,041 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 at 2.

49.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

13

Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

50.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Company failed to adequately monitor the Committees and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

51.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

52.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for

14

Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

53.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

54.    The Plan is a defined contribution plan covering substantially all eligible employees of Ramboll. *See* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 10. ("The Plan is a defined contribution plan generally covering all employees of the Company who are age 18 or older. The Plan was established on February 1, 1999, and was restated effective May 9, 2022, and is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

55.    Included in the Plan's available funds was the Guaranteed Income Fund offered by Prudential Retirement Insurance and Annuity Company. *See id*., at 16 ("The Prudential Guaranteed Income Fund (GIF) is a group annuity insurance contract issued by Prudential Retirement Insurance and Annuity Company (PRIAC) and is backed by the full faith and creditworthiness of the issuer.").

56.    At the end of 2020, $75,079,881 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 17.

15

57. At the end of 2024, over $61 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 19.

58. The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF | Total Amount of Plan Assets | Plan Assets in Prudential GIC as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $75,079,881 | $551,853,326 | 13.61% |
| 2021 | $77,082,135 | $634,741,177 | 12.14% |
| 2022 | $78,253,991 | $528,402,425 | 14.81% |
| 2023 | $70,307,335 | $602,926,779 | 11.66% |
| 2024 | $61,954,256 | $659,089,426 | 9.40% |

*Contributions*

59. "You are an 'Eligible Employee' if you are employed by Ramboll US Consulting, Inc. and its US-based affiliated entities or any affiliate who has adopted the Plan." SPD, at 1.

60. Eligible employees may elect to make contributions to their Plan accounts and receive company matching contributions. *See id.* ("You will become eligible to make Elective Deferral Contributions and Voluntary Contributions and receive Employer Matching Contributions on the date you attain age 18, provided that you are an Eligible Employee on that date.").

61. Participants were also eligible to receive non-elective contributions to their Plan accounts. *See id.* ("You will become a Participant with respect to Non-Elective Contributions on the date you attain age 18 and you complete 3 months of service, provided that you are an Eligible Employee at the end of that period.")

16

62.    There is an automatic contribution feature in the Plan. *See id*., at 2 ("After receiving a notice from the Plan Administrator, you will be deemed to have made an Elective Deferral Contribution election in the amount of 3% of your Plan Compensation. The amount of such automatic enrollment will increase by 1% up to a maximum of 12% of your Plan Compensation.").

63.    Like other companies that sponsor 401(k) plans for their employees, Ramboll enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

64.    Ramboll also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See*, https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

65.    Given the size of the Plan, Ramboll likely enjoyed significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO SELECT AND MONITOR THE PRUDENTIAL GIF IN A PRUDENT MANNER

### A.    The Prudential GIF in the Plan

66.    As indicated above, the Plan was invested in the Prudential GIF, a proprietary stable value fund managed by Prudential.

67.     A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[7]

68.     Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[8]

69.     The Prudential GIF is thus a contract and not a mutual fund investment.  To be sure, there are important differences between a mutual fund and stable value fund.  Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

70.     There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prudential GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

71.     Here, "[t]he [Prudential] GIF is a traditional guaranteed investment contract (GIC) and deemed to be fully benefit- responsive. Because the GIF is fully benefit-responsive, contract value is the relevant measurement attribute for that portion of the net assets available for benefits attributable to the guaranteed investment contract." Auditor's Report, attached to the 2023 Form 5500 for the Plan, at 13.

72.     The Auditors' Report attached to the 2024 Form 5500 for the Plan states as follows:

---

[7] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[8] *Id.*

*The Prudential Guaranteed Income Fund (GIF) is a group annuity insurance contract issued by Prudential Retirement Insurance and Annuity Company (PRIAC) and is backed by the full faith and creditworthiness of the issuer.* Under the group annuity insurance contract that supports this product, participants may ordinarily direct permitted withdrawal or transfers of all or a portion of their account balance at contract value within reasonable timeframes. Contract value represents deposits made to the contract, plus earnings at guaranteed crediting rates, less withdrawals and fees.

*The GIF is a traditional guaranteed investment contract (GIC) and deemed to be fully benefit- responsive.* Because the GIF is fully benefit-responsive, contract value is the relevant measurement attribute for that portion of the net assets available for benefits attributable to the guaranteed investment contract. There are no reserves against contract value for credit risk of the contract issuer or otherwise.

*Certain events limit the ability of the Plan to transact at contract value with the issuer.* Such events include the following: (1) amendments to the Plan documents (including complete or partial plan termination or merger with another plan), (2) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions, (3) bankruptcy of the Plan Sponsor or other Plan Sponsor events (for example, divestitures or spin-offs of a subsidiary) that cause a significant withdrawal from the Plan, or (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA. The *Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are not probable of occurring.*

*The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date.*

Auditors' Report attached to the 2024 Form 5500 for the Plan, at 13 (emphasis added).

73.     Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

74.     For the above reasons, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity

contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive,[9] (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The Prudential GIF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making stated risk considerations equivalent.

75.     As discussed below, Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**B.      Defendants Failed ERISA's High Standards Regarding Process and Methodology for Evaluating Investments**

76.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

77.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

78.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that

---

[9] *See* Auditors' Report attached to the 2024 Form 5500 for the Plan, at 11 ("The Guaranteed Income Fund is a fully benefit-responsive investment contract with Empower.")

arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

79. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

80. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

81. Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing GIC providers.

82. In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs. In fact, the IPS for the Plan lists no benchmark for the Prudential GIF. Instead, the IPS simply states a Stable Value/Money Market should be selected for the Plan. Further this option is described as:

> Options that primarily invest in fixed income securities. Compared to other fixed income options, these funds provide fairly consistent levels of return and risk.

IPS at 2.

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

21

83. The Plan only offers one stable value product. Participants wishing to invest in a stable value product in the Plan have no choice other than the Prudential GIF. Accordingly the IPS does not limit the fiduciaries ability to investigate and select other types of GICs.

84. Accordingly, the measurement of stable value funds, and specifically the Prudential GIF, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

85. Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[11]

86. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

87. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

88. It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

89. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement*

---

[11] *See* https://www,investopedia.com/terms/p/peer-group.asp (last visited Jan. 29, 2026).

*o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

90.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

91.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on August 19, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

92.     By letters dated September 18, 2025 and September 24, 2025, the Plan's administrator responded to Plaintiffs' request. No meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the Prudential GIF provided.

93.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of

a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

94.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

95.     In particular, Defendants failed to (1) consider the undue riskiness of the Prudential GIF, and (2) failed to prudently monitor the Prudential GIF, by among other things, determining readily available alternative stable value funds to replace the imprudent Prudential GIF.

96.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**C.     Defendants Failed to Consider the Undue Riskiness of the Prudential GIF**

97.     "When evaluating a traditional GIC, the most important consideration for the fiduciary . . . is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[12]

**1.     Prudential/Empower Pose A Severe Risk Of Becoming Insolvent**

**a.     The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable**

---

[12] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

98.     Because a guaranteed insurance account product – like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

99.     A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

100.     The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[13]

---

[13] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

101.     These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

        **b.**     **Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency**

102.     Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

103.     An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**LIABILITIES, SURPLUS AND OTHER FUNDS**

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| 28. Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. Common capital stock | 2,500,000 | 2,500,000 |
| 30. Preferred capital stock | | |
| 31. Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. Surplus notes | 0 | |
| 33. Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. Less treasury stock, at cost: | | |
| 36.1 ____ shares common (value included in Line 29 $ ____ ) | | |
| 36.2 ____ shares preferred (value included in Line 30 $ ____ ) | | |
| 37. Surplus (Total Lines 31+32+33+34+35-36) (including $ ____ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $ 1,018,399,778  EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 106,414,669,390  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**     0.96%     National Average is About **7.5%.**

104.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | |
|---|---|---|
| 28. Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. Common capital stock | | |
| 30. Preferred capital stock | | |
| 31. Aggregate write-ins for other-than-special surplus funds | | |
| 32. Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. Less treasury stock, at cost: | | |
| 36.1 _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus: $ 26,427,441,247  EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 218,473,153,964  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**    **12.10%**    National Average is About **7.5%**.

c.    **Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

105.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

27



| ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity In |
| SCHEDULE S - PART 3 - SECTION |

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Ber

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Reserve Cr |
| NAIC Company Code | ID Number | Effective Date | Name of Company | Domi-ciliary Juris-diction | Type of Reinsurance Ceded | Type of Business Ceded | Amount in Force at End of Year | 9 Current Year |
|---|---|---|---|---|---|---|---|---|
| 0399999. Total General Account - Authorized U.S. Affiliates | | | | | | | 0 | 0 |
| 0699999. Total General Account - Authorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 0799999. Total General Account - Authorized Affiliates | | | | | | | 0 | 0 |
| ...65676 ..... | ...35-0472300 .. | 01/01/1998 . | Lincoln National Life Insurance Company ............................................... | IN......... | ...........CO/I............ | ...........VA......... | .....................0 | ...............................0 |
| ...66869 ..... | ...31-4156830 .. | 12/31/2023 . | Nationwide Insurance ............................................................................... | OH......... | ...........CO/G............ | ...........FA......... | .....................0 | ...............161,418 |
| 0899999. General Account - Authorized U.S. Non-Affiliates | | | | | | | 0 | 161,418 |
| 1099999. Total General Account - Authorized Non-Affiliates | | | | | | | 0 | 161,418 |
| 1199999. Total General Account Authorized | | | | | | | 0 | 161,418 |
| 1499999. Total General Account - Unauthorized U.S. Affiliates | | | | | | | 0 | 0 |
| 1799999. Total General Account - Unauthorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 1899999. Total General Account - Unauthorized Affiliates | | | | | | | 0 | 0 |
| 2199999. Total General Account - Unauthorized Non-Affiliates | | | | | | | 0 | 0 |
| 2299999. Total General Account Unauthorized | | | | | | | 0 | 0 |
| 2599999. Total General Account - Certified U.S. Affiliates | | | | | | | 0 | 0 |
| 2899999. Total General Account - Certified Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 2999999. Total General Account - Certified Affiliates | | | | | | | 0 | 0 |
| ....00000 ..... | ...AA-3191255 .. | 12/31/2022 . | Hannover Life Reassur Co. of Amer (Bermuda) LTD ............................... | BMU......... | ...........COFW/G............ | ...........FA......... | .....................0 | ...........2,638,835,092 |

106. Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

SCHEDULE S - PART 3 - SECTION 1

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Company as of December 31, Current Year

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Reserve Credit Taken | | 11 | Outstanding Surplus Relief | | 14 |
| NAIC Company Code | ID Number | Effective Date | Name of Company | Domi-ciliary Juris-diction | Type of Reinsurance Ceded | Type of Business Ceded | Amount in Force at End of Year | 9 Current Year | 10 Prior Year | Premiums | 12 Current Year | 13 Prior Year | Modified Coinsurance Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...00000 ..... | ...AA-3191255 .. | 12/31/2022 . | Hannover Life Reassur Co. of Amer (Bermuda) LTD ............. | BMU......... | ...MCOFW/G........ | ...VA......... | .........0 | .........0 | .........0 | .........0 | .........0 | .........0 | ...25,384,625,880 |

107. The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

EAIC Reinsurance Ceded Offshore vs Surplus
At December 31, 2024
**[All data in Billions]**

| | Reins Balance | Surplus |
|---|---|---|
| $ | 28.00 | $  1.02 |

EAIC Reserve Credit & ModCo Offshore vs Surplus

| | Reins Balance | Surplus |
|---|---|---|
| | $28.00 | $1.02 |

108.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[14]

109.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[15] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

### d.    Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations

110.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less

---

[14] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

[15] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp

traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

111.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



112.    Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

113.    In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### D.    The Prudential GIF Materially Underperformed Relative to Comparator Stable Value Fund GICs

114.    The Prudential GIF is imprudent for other reasons.  Selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals.  That is because stable value products are substantially similar in that their stated goal is to preserve income.

115.    Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit competitive bids.

116.    The Plan's fiduciaries took no such steps. Had Defendants continually monitored and evaluated the Prudential GIF's rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

117.     If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns.

118.    As stated above, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. Additionally, the Prudential GIF's

31

crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making risk considerations equivalent.

119. The Comparator GICs below meet these requirements. Importantly, the Prudential GIC had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

120. Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1. There are Many GICs in the Marketplace with Competitive Crediting Rates

121. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

122. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

123. As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prudential GIF, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*., at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The Shands Jacksonville Retirement Plan offers a traditional guaranteed investment contract with Variable Annuity Life Insurance Company ("VALIC"). Auditor's Report, attached to the 2023 Form 5500 for the Shands Jacksonville Retirement

Plan, at 12. "The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan" and the contract is "dependent on the third-party issuer's ability to meet its financial obligations." *Id*. Like the Prudential GIF, "No events are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuers and that also would limit the ability of the Plan to transact at the contract value with the participants." *Id*.

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id*. Like the Prudential GIF, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id*.

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id*. Like the Prudential GIF, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants. *Id*.

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id*., at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id*. Like the Prudential GIF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 9.

124. Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Shands Jacksonville Retirement Plan, the Ameritas 401(k) Retirement Plan, The Standard

33

401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator GICs."

125. The Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

126. The Prudential GIF's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

<blockquote><b>a.     The Prudential GIF performed poorly when compared to the Comparator Funds at the Start of the Class Period</b></blockquote>

127. In 2020, the GIC offered in the Auto-Owners Insurance Company Retirement Savings Plan and the Shands Jacksonville Retirement Plan performed much better than the Prudential GIF. Specifically, the GIC offered in the Auto-Owners Insurance Company Retirement Savings Plan had a calculated crediting rate of 3.07%. The GIC offered in the Shands Jacksonville Retirement Plan had a calculated crediting rate of 4.33%. The stated crediting rate for the Prudential GIF was 1.92% in 2020.

128. The table below demonstrates the underperformance of the Prudential GIF compared to the Comparator Funds.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[16] |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Shands Jacksonville Retirement Plan | 6,138 | $322,951,592 | VALIC | 4.33% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **Ramboll Plan** | **2,617** | **$551,853,326** | **Prudential** | **1.92%** |

129.    In 2020, the Prudential GIF underperformed the Comparator GICs by 46.22%.

130.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |

---

[16] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

35

| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
|---|---|---|---|---|---|
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Ramboll Plan** | **2,617** | **$551,853,326** | **Prudential** | **1.92%** |

**b.    The Prudential GIF's Poor Performance Continued through 2021**

131.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Shands Jacksonville Retirement Plan | 6,218 | $371,794,130 | VALIC | 4.43% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |

| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
|---|---|---|---|---|---|
| | **Ramboll Plan** | **2,695** | **$634,741,177** | **Prudential** | **1.67%** |

132.    In 2021, the Prudential GIF underperformed the Comparator GICs by 52.40%.

133.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Ramboll Plan** | **2,695** | **$634,741,177** | **Prudential** | **1.67%** |

    **c.**    **The Comparator Funds Outperformed the Prudential GIF in 2022**

134.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2022.

37

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|--------------------|-------------|-------------------|----------------|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Shands Jacksonville Retirement Plan | 6,782 | $343,252,624 | VALIC | 4.30% |
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **Ramboll Plan** | **2,806** | **$528,402,425** | **Prudential** | **1.68%** |

135. In 2022, the Prudential GIF underperformed the Comparator GICs by 52.76%.

136. Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|--------------------|-------------|-------------------|----------------|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |

| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
|---|---|---|---|---|---|
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Ramboll Plan** | **2,806** | **$528,402,425** | **Prudential** | **1.68%** |

**d.    The Prudential GIF's Poor Performance Continued through 2023**

137.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Shands Jacksonville Retirement Plan | 7,204 | $396,147,444 | VALIC | 4.31% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |

39

| | | | | |
|---|---|---|---|---|
| The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| **Ramboll Plan** | **2,960** | **$602,916,779** | **Prudential** | **2.05%** |

138.    In 2023, the Prudential GIF underperformed the Comparator GICs by 47.97%.

139.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as Prudential GIF in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Ramboll Plan** | **2,960** | **$602,916,779** | **Prudential** | **2.05%** |

e.      **The Comparator Funds Outperformed the Prudential GIF in 2024**

140.    In 2024, the Comparator Fund outperformed the Prudential GIF.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Shands Jacksonville Retirement Plan | 7,498 | $443,251,343 | VALIC | 4.38% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |
| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
| | **Ramboll Plan** | **3,041** | **$659,089,426** | **Prudential** | **2.24%** |

141.    In 2024, the Prudential GIF underperformed the Comparator GICs by 44.35%.

142.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2024, as demonstrated in the table below.

41

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
|  | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
|  | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
|  | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
|  | **Ramboll Plan** | **3,041** | **$659,089,426** | **Prudential** | **2.24%** |

143.    Throughout the Class Period, the Prudential GIF underperformed the GICs in the Auto-Owners Insurance Company Retirement Savings Plan and the Shands Jacksonville Retirement Plan by an average of over 48% as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator GIC Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.92% | 3.57% | 46.22% |
| 2021 | 1.67% | 3.51% | 52.40% |
| 2022 | 1.68% | 3.56% | 52.76% |
| 2023 | 2.05% | 3.94% | 47.97% |
| 2024 | 2.24% | 4.03% | 44.35% |
| Average Underperformance during Class Period | | | 48.74% |

144.    The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential GIF's dismal crediting rate.

145.    Again, the specific Comparator Funds used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Funds were fully benefit-responsive.

146.    In short, because the Plan held over $500 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

147.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

148.    By selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

149.    With the significant amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating costing the Plan and its participants millions of dollars.  Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[17]

---

[17] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

150.    In sum, the Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

151.    Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the Prudential GIF required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers.  All of which they failed to do.

## VII.    ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

152.    Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)    furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

153.    Section 1106(b) further provides, in pertinent part:

> A fiduciary with respect to the plan shall not –

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

154.    During the Class Period, Defendants allowed Plan assets to be invested in the Prudential GIF that performed poorly when compared to other investments that were available, and knowing that Prudential, or its affiliates, were/are offering recordkeeping and trustee services to the Plan.

155.    Prudential was a party in interest[18] to the Plan as was receiving compensation for managing/maintaining the Prudential GIF, as well as indirect compensation from the spread – the difference between the amount Prudential earned on the investments and the amount Prudential paid to Plan participants.

156.    As an alternative to investing Plan assets in the Prudential GIF, the Plan could have invested assets in better performing investments with the same investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Prudential.

157.    Defendants did not prudently and objectively evaluate the Prudential GIF in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Prudential GIF in order to benefit Prudential and its affiliates.

---

[18] "[C]ertain Plan investments are managed by Prudential. Prudential is the trustee as defined by the Plan and, therefore, these transactions qualify as party-in-interest transactions[.]" Auditors' Report, attached to 2020 Form 5500 for the Plan, at 15.

45

158. The Plan's sizeable investment in the Prudential GIF provided Prudential a substantial amount of compensation at the expense of Plan participants.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Fiduciary Committee and Investment Committee Defendants)

159. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

160. At all relevant times, the Fiduciary Committee and the Investment Committee, and their members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

161. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

162. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Prudential GIF based solely on the merits of the investment and what was in the best interest of Plan's participants. Instead, the Prudence Defendants selected and retained the Prudential GIF in the Plan despite poor performance in relation to other comparable investments.

163. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs

46

and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

164. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

165. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company, the Board, and the Settlor Committee Defendants)**

166. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

167. Ramboll, its Board, and the Settlor Committee Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Fiduciary Committee and Investment Committee, and the duty to monitor the Fiduciary Committee and Investment Committee. Monitoring Defendants were aware that the Fiduciary Committee and Investment Committee had critical responsibilities as fiduciaries of the Plan.

168. In light of this authority, the Monitoring Defendants had a duty to monitor the Fiduciary Committee and Investment Committee to ensure that the Fiduciary Committee and Investment Committee were adequately performing their fiduciary obligations, and to take prompt

47

and effective action to protect the Plan in the event that the Fiduciary Committee and Investment Committee were not fulfilling those duties.

169.    The Monitoring Defendants also had a duty to ensure that the members of the Fiduciary Committee and Investment Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company, the Board, and the Settlor Committee.

170.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Fiduciary Committee and Investment Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Fiduciary Committee and Investment Committee's imprudent actions and omissions.

171.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

172.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Fiduciary Committee and Investment Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT III
### PROHIBITED TRANSACTION
#### (against all Defendants)

173.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

174.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

175.    Defendants were at all times fiduciaries to the Plan.

176.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

177.    Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Prudential.

178.    Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential and the Plan.

179.    When Defendants caused the Plan to engage in the annuity transaction, Prudential was a party in interest because, *inter alia*, Prudential, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

49

180.    These transactions occurred each time the Plan paid fees to Prudential in connection with the Plan's investments in the Prudential GIF and other proprietary options that paid revenue sharing to Prudential.

181.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: February 20, 2026                    Respectfully submitted,

/s/ *Langston McFadden*
Langston McFadden, Esquire
New York Bar #4269247
**PULLANO & FARROW**
401 Main Street
East Rochester, NY  14445

51

Telephone: (585) 730-4773
Email: lmcfadden@lawpf.com

Mark K. Gyandoh, Esquire
PA Attorney ID #88587
James A. Maro, Esquire
PA Attorney ID #86420
(Admissions *Pro Hac Vice* to be Requested*)*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel.: (610) 890-0200
Email: markg@capozziadler.com
        jamesm@capozziadler.com

*Counsel for Plaintiffs and the Putative Class*